IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

THERESA CLAYTON,

                    Plaintiff

        v.

UNITED STATES OF AMERICA, et
al.

                    Defendants

HONORABLE JEROME B. SIMANDLE

Civil No. 10-3127 (JBS/KMW)

**OPINION**

APPEARANCES:

Jason Daria, Esq.
John M. Dodig, Esq.
Feldman, Shepard, Wohlegelertner & Tanner
1845 Walnut St.
25th Floor
Philadelphia, PA 19103
     Attorney for Plaintiff Theresa Clayton

Paul Blaine, AUSA
Office of the United States Attorney
Camden Federal BLDG & U.S. Courthouse
401 Market St.
4th Floor
Camden, N 08101
     Attorney for Defendant United States

Dana Charles Argeris, Esq.
Marshall Dennehey Warner Coleman & Goggin
220 Lake Drive East
Suite 300
Cherry Hill, NJ 08002
     Attorney for Defendant Eastern Construction and Electric

Stephen A. Rudolph, Esq.
Monte & Rudolph, PA
800 The Plaza
P.O. Box 255
Sea Girt, NJ 08750
     Attorney for Defendant Meridian Management Corporation

**SIMANDLE**, Chief Judge:

I.    **INTRODUCTION**

On June 21, 2008, Steven Clayton died after touching an energized power wire while working on a utility pole replacement project at Fort Hamilton U.S. Army base in Brooklyn, New York. Theresa Clayton, as the wife of the deceased and administrator of his estate, seeks compensation from the United States, NorthStar Technology Corporation ("Northstar"), Eastern Construction & Electric, Inc. ("Eastern"), and Meridian Management Corporation ("Meridian") for their respective roles in the accident.

Before the Court are Defendant United States' motion for summary judgment [Docket Item 48] and Defendant Meridian's motion for summary judgment [Docket Item 51].

For the reasons explained herein, the United States' motion will be granted in part and denied in part and Meridian's motion will be granted. The Court's principal holdings are: (1) both New York and New Jersey law yield the same outcome on both motions; (2) disputed issues of material fact exist regarding the extent of the Army's supervision of Steven Clayton; and (3) no disputed issues of material fact exist regarding whether Meridian owed Steven Clayton a duty of care.

## II.   JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1346(b)(1) because federal district courts have original jurisdiction over claims seeking money damages for personal injury and death caused by the negligent and wrongful acts and omissions of the employees of the United States. The Court has supplemental jurisdiction over the remaining Defendants and claims pursuant to 28 U.S.C. § 1367(a) since the remaining claims are so related to the claims against the United States.[1]

## III. PROCEDURAL HISTORY

Defendants NorthStar and Eastern both moved for partial summary judgment on the question of whether Clayton was acting as an employee for one or both entities under the relevant workers' compensation laws. [Docket Items 31 & 32.] Eastern's motion was unopposed and, because there was good cause, the Court granted it. [Docket Items 53 & 54.] It is therefore

---

[1] As explained below, the United States' motion for summary judgment will be denied in large part. The United States will remain a party and, therefore, the Court's supplemental jurisdiction over the remaining parties and claims remains proper. Additionally, it appears that diversity jurisdiction would exist pursuant to 28 U.S.C. § 1332 as to the claims of Plaintiff (a New Jersey citizen) against Defendant Northstar (a Nevada corporation with principal place of business in California) and against Defendant Meridian (a Florida corporation with principal place of business in Florida).

3

established that Clayton was working as an employee of Eastern. The Court denied Northstar's motion, as Clayton's alleged status as a special employee of Northstar is a matter of genuine factual dispute. [Docket Items 53 & 54.]

### IV.  FACTUAL BACKGROUND

The Army needed to replace several high voltage utility poles at Fort Hamilton. Northstar had entered into a Basic Ordering Agreement ("BOA") to handle construction services at Fort Hamilton. Robert Downes was employed by the Army at Fort Hamilton as a Lead Construction Representative, and he served as the Contracting Officer's Representative for the utility pole project. (Army Statement of Facts ("SOF") ¶ 24.) Northstar did not handle high voltage electrical projects. Downes had known Mike Dietz, a high voltage electricity lineman, since the early 1990s because Dietz had worked on at least 15 projects at Fort Hamilton. (Army SOF ¶ 40.) When looking for a subcontractor to replace the poles, Downes suggested that Northstar contact Dietz to see if his employer could put in a bid. (Downes August 21, 2009 Dep. 29:25-30:15.) Dietz's employer at the time was Eastern and, on November 30, 2007, NorthStar subcontracted with Eastern to have Eastern replace the poles.

Steven Clayton supervised a three-man crew for Eastern that also included Dietz and Chuck Miller, a groundman.

4

On the morning of June 1, 2008, Clayton's crew planned to replace utility pole number 123. The power lines leading to pole 123 were supposed to be shut down or de-energized. Before the work on pole 123 began, Dietz went to pole 136 to de-energize the wires going to pole 123. Dietz missed de-energizing one of the wires because the wires were in a unique configuration. (Dietz Dep. 112:2.) Unfortunately, Clayton did not test the wires before touching them. (Dietz Tr. 118, 194-95; see also Docket Item 48-37 at 3.) When Clayton went up to pole 123 in his utility bucket, his shoulder and hand touched an energized wire. He died from electrocution.

Plaintiff filed negligence, wrongful death, and survival claims against the United States pursuant to the Federal Tort Claims Act ("FTCA"). Plaintiff also filed negligence, reckless and intentional conduct, wrongful death, survival, and punitive damages against Meridian and the other corporate Defendants.

## V.    LEGAL ANALYSIS

### A. CHOICE OF LAW

There are two sets of briefing before the Court. In the briefing regarding the Army's motion for summary judgment, both the Army and the Plaintiff cited New York state case law discussing duties owed by landowners and general contractors. The Army stated, "As the actions complained of on the part of

the Army took place in New York, that state's tort law provides the controlling substantive legal principles." (Army Mot. Summ. J. at 18-19.) Neither the Army nor the Plaintiff disputed the applicability of New York law in assessing the Army's motion. In the briefing regarding Meridian's motion for summary judgment, both Meridian and Plaintiff cited New Jersey state law discussing when a duty of care exists. Neither Meridian nor the Plaintiff disputed the applicability of New Jersey law in assessing Meridian's motion. None of the parties conducted a choice of law analysis.[2]

The Court must determine which state's substantive law applies. Plaintiff Theresa Clayton is a citizen of New Jersey. (Compl. ¶ 1.) Meridian is a Florida corporation. (Compl. ¶ 5.) The electrocution accident occurred in New York. The Court hearing the action is in the District of New Jersey.

The FTCA waives sovereign immunity and grants district courts jurisdiction over tort claims against the United States "under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred.*" 28 U.S.C. § 1346(b)(1) (emphasis added). In other words, "it is the substantive law of the State wherein the cause of action accrues

---

[2] The parties are encouraged to give greater attention to choice of law analysis in any subsequent briefing and at trial.

which governs the liability of the United States on claims brought under the Federal Tort Claims Act." Ciccarone v. United States, 486 F.2d 253, 257 (3d Cir. 1973). In this case, all of the allegations before the Court involve acts that occurred in New York. In a multistate tort action, the Federal Tort Claims Act ("FTCA") requires a federal court to apply the whole law of the place where the acts of negligence occurred, including its choice-of-law rules. 28 U.S.C. §§ 1346(b), 2674; Richards v. United States, 369 U.S. 1 (1962). The Court must therefore apply New York's choice of law rules.

Under New York law, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." Matter of Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 223, 613 N.E.2d 936, 937 (1993). "It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis." Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998). "If no conflict exists, then the court should apply the law of the forum state in which the action is being heard." Excess Ins. Co. Ltd. v. Factory Mut. Ins. Co., 2 A.D.3d 150, 151, 769 N.Y.S.2d 487, 489 (2003), aff'd sub nom. Excess Ins. Co. Ltd. v. Factory Mut. Ins., 3 N.Y.3d 577, 822 N.E.2d 768 (2004).

The Court declines, at this time, to resolve all choice of law questions that may pertain to this case. For purposes of deciding the present motions, the Court finds that there is no conflict because (1) under either New York or New Jersey law, Meridian did not owe the decedent a duty of care and (2) under either New York or New Jersey tort law, there are disputed issues of material fact that preclude the Court from granting summary judgment for the Army.

### B. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id. The district court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." Scott v. Harris, 550 U.S. 372, 378 (2007).

Once the moving party has supported its motion, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A summary judgment movant may meet its burden by showing that the opposing party is unable to meet its burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Nonetheless, Defendants, as the moving parties on the motion, bear the initial responsibility of demonstrating the absence of a genuine issue of material fact. Id.

### C. THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

The United States argues four main points in its summary judgment motion. First, the United States argues that Theresa Clayton failed to present an administrative claim to the Army seeking recovery in her personal or individual capacity before she commenced the lawsuit. This failure should, the Army argues, bar her claims because the Federal Tort Claims Act ("FTCA") requires claimants to present administrative claims before filing lawsuits. Second, the United States argues that the Army was not supposed to, and did not supervise the work of Steven Clayton and the other Eastern employees. Third, the Army argues that the administrative claim form that Theresa Clayton did submit as administrator of her husband's estate only provided

9

notice of a failure to supervise claim; as a result, the Army argues that all other claims are barred. Fourth, the Army argues that the Army owed no duty of care in the circumstances of this case because the work performed was inherently dangerous and carried out in a careless manner.

The Court will address each argument in turn.[3] For the reasons explained herein, the Army's motion will be substantially denied because material issues of disputed fact exist regarding the Army's supervision of Clayton.

### 1. The FTCA Bars Claims in Theresa Clayton's Individual Capacity

The Army correctly argues that Theresa Clayton's failure to present administrative claims to the Army before filing this lawsuit precludes her from seeking relief in her individual or personal capacity. The Federal Tort Claims Act "operates as a limited waiver of the United States's sovereign immunity." White-Squire v. U.S. Postal Service, 592 F.3d 453, 456 (3d Cir.

---

[3] Eastern filed a response [Docket Item 59] to the Army's motion for summary judgment. Without admitting liability, Eastern joined Plaintiff's arguments regarding the sufficiency of the administrative claims notice and the Army's contractual and common law duties. Eastern also noted that, as a third party plaintiff against third party defendant the Army, Eastern is not bound to comply with the administrative notice requirements in 28 U.S.C. § 2675. The United States responded [Docket Item 67] to Eastern, arguing that the Court should disregard Eastern's response because it was not timely. Eastern's response does not impact the Court's analysis of the Army's and Meridian's motions and, therefore, the Court need not decide whether it was properly filed.

2010).  Because this waiver is limited, its terms "define the court's jurisdiction to entertain the suit." <u>Bialowas v. United States</u>, 443 F.2d 1047, 1048-49 (3d Cir. 1971).  The FTCA mandates that "[a]n action shall not be instituted upon a claim against the United States . . . unless the claimant shall have first presented the claim to the appropriate Federal agency." 28 U.S.C. § 2675(a). This administrative exhaustion requirement "is jurisdictional and cannot be waived." <u>Lightfoot v. United States</u>, 564 F.3d 625, 627 (3d Cir. 2009).

The FTCA requires that "*each* claim and *each* claimant meet the prerequisites for maintaining a suit against the government." <u>Dalrymple v. United States</u>, 460 F.3d 1318, 1325 (11th Cir. 2006) (citing 28 U.S.C. § 2675(a)). This rule applies without exception, even when one spouse's claims arise from an incident in which the other spouse was harmed. Theresa Clayton's claims "are derivative from claims of [her] injured spouse, but still need to be filed separately with the agency." <u>See</u> <u>Lay v. United States</u>, 3:10-CV-2623, 2011 WL 1655824 (M.D. Pa. May 2, 2011). Theresa Clayton did not file a claim in her individual capacity[4] and, therefore, all claims seeking relief for her individual capacity will be dismissed.

---

[4] The Army submitted a declaration from Lorenzo Ferguson, Chief of Operations and Records at the U.S. Army Claims Service, stating that "[a] thorough search of all records available to this Service has found that no administrative claim was filed by

The case caption presently reads, "Plaintiff Theresa Clayton, individually and as Administratrix . . . of the Estate of Steven Clayton. . . ." The word "individually" shall be deleted; the caption shall now read "Plaintiff Theresa Clayton, as Administratrix . . . of the Estate of Steven Clayton. . . ."

Because Theresa Clayton cannot assert claims in her individual capacity, the Army also argues that Count I, which alleges negligence against the United States, is subsumed within Counts IV, which alleges wrongful death, and V, which alleges survival. The Army argues that wrongful death actions compensate the decedent's survivors for losses due to tortious conduct and survival actions preserve for the decedent's estate any personal cause of action that the decedent would have had if he had survived. The wrongful death and survival claims do not preclude Theresa Clayton, as administratrix, from bringing a negligence claim. Plaintiff's negligence claim will stand.[5]

## 2. Material Disputed Facts Exist Regarding the Army's Supervision of Clayton

The Army argues that it was not supposed to and did not supervise the work of Steven Clayton and the other Eastern

---

THERESA CLAYTON in her individual capacity. . . ." (Ferguson Decl. ¶ 2.)

[5] To be clear, all the claims against the United States, i.e. negligence, wrongful death, and survival, may only be brought by Theresa Clayton in her capacity as administratrix, not in her individual capacity.

employees. The FTCA "allows a plaintiff to bring an action
against the United States that alleges that the acts or
omissions of United States employees or agencies were
negligent." Ryan v. United States, 233 F. Supp. 2d 668, 675-76
(D.N.J. 2002); see also 28 U.S.C. § 1346(b)(1). But the United
States cannot be held liable for the actions or conduct of a
contractor or subcontractor. 28 U.S.C. § 2671. The principal
distinction between an independent contractor and an employee is
the extent to which the federal government "control[s] the
detailed physical performance" of the job. Logue v. United
States, 412 U.S. 521, 528 (1973); Norman v. United States, 111
F.3d 356, 357 (3d Cir. 1997). If a federal actor supervises the
day-to-day operations of the job, the contractor is considered
an employee of the government. United States v. Orleans, 425
U.S. 807, 815 (1976). Essentially, if Eastern was an independent
contractor, then the Army cannot be liable under the FTCA for
Clayton's death; but, if the Army was supervising Eastern's day-
to-day operations, then Eastern would be considered an employee
and the Army could be subject to FTCA liability.

The Army argues that summary judgment is proper because
Eastern was an independent contractor over which the Army did
not exercise supervisory authority. The Army argues that "Downes
did not supervise Clayton, as Clayton was the employee of an
independent contractor and the Army was prohibited by the

13

pertinent contract documents from supervising such a person, and did not in fact do so." (Army Br. Supp. Mot. Summ. J. at 2.) The Army emphasizes that Northstar was expressly and exclusively responsible for supervising and managing Eastern's work. The Army argues that Downes "was involved in coordinating that [pole replacement] work, but had no responsibility for the actual work done in shutting down or de-energizing the lines." (Army Br. Supp. Mot. Summ. J. at 8.) Specifically, the Army states that Downes "provided no technical oversight or supervision, and did not give directions to Clayton or Dietz in their work, or tell them how to do their work." (Army Br. Supp. Mot. Summ. J. at 9.) The Army claims that, "if Clayton and Dietz wanted to do [Pole 123] another way, Downes would have gone along with that." (Army Br. Supp. Mot. Summ. J. at 12.)

But there is a material issue of disputed fact regarding the extent of the Army's supervision of Clayton; a reasonable fact-finder could find that the Army did, in fact, supervise Eastern and Clayton. For example, in his deposition, Dietz, the lineman on Clayton's crew, testified that, on the day of the incident, Downes directed Dietz to go disconnect the jumpers at Pole 136. (Dietz Dep. 124:25-125:3.) Dietz also explained that jumpers were being disconnected, instead of air switches, because Downes wanted to minimize the power outage to buildings in the area. (Dietz Dep. 125:9-21.) Dietz explained that Downes

14

made the decision regarding the method by which the team would work on Pole 123: "It didn't get into a heated discussion, but [Downes] made the decision that we were going to lift the taps so that we wouldn't lose the power. And that was it." (Dietz Dep. 199:2-6.) In addition, the Eastern team had begun set-up work for Pole 123 on June 20th, but Downes "told us to stop working on it on Friday, we had to stop working on it and come down." (Dietz Dep. 157:16-21.)

In addition to the testimony of Eastern crewmember Dietz, there is other evidence indicating that Downes had a supervisory role. For example, Frances Chiang, President of NorthStar, submitted a declaration stating, "The pole replacement specifications were developed by Eastern and the Army. Bobby Downs from the Army was the final say in the specifications and Eastern followed their lead." (Docket Item 58-7 ¶ 9.) Narendra Mohan, Northstar's Business Manager, made a similar declaration: "The pole replacement specifications were developed by Eastern and the Army. The Army was the final say in the specifications and Eastern followed their lead." (Docket Item 58-8 ¶ 8.) Luis Bolanos, Eastern's President and Owner, testified that the decision of whether to replace pole 123 while wires were still energized or while they were shut down "would have been a determination done by my superintendent in the field and Mr. Downes at the base." (Bolanos Dep. 306:14-17.)

Downes himself described actions that a reasonable fact-finder could interpret as indicative of a supervisory relationship. For example, on June 2, 2008, Downes emailed Luis Bolanos to request that, for the upcoming work week, the Eastern team have "temporary high voltage jumpers, high voltage phasing tester, and have them meet me at my office before any work starts." (Docket Item 48-25; see also Downes Dep. 186:7:13.) Downes also testified that, on the day of Clayton's accident, he noticed that Clayton was working without his helmet, and Downes "got out of the car and yelled at him to put his helmet on, which he came down and put his helmet on." (Downes Dep. 84:14-18.) These instances in which Downes specified the equipment that the Eastern team should be using would allow a reasonable fact-finder to conclude that he "control[ed] the detailed physical performance" of the job. See Logue v. United States, 412 U.S. 521, 528 (1973).

Charles E. Miller, the third member of the Eastern crew with Dietz and Clayton, submitted a statement on July 23, 2008 in which he stated that he believed that Downes and Deitz were supposed to verify that power was off. (Docket Item 58-9 at 3.) When Miller was asked who supervised Dietz, Miller responded that Downes did. (Docket Item 58-9 at 3.) In a recorded statement, also on July 23, 2008, when asked to whom Clayton reported, Miller said, "It's my understanding that Bobby Downs

[sic] was the one that controls the job here and the contract."
(Docket Item 58-10 at 5.) In addition, in response to the
question "Who's responsibility again was it to shut down the
lines?" Miller said:

> Michael Dietz himself was the one that actually would
> go up in the air in the truck and do the work of
> shutting off the poles. Now Bobby Downs [sic] was the
> one that was in charge of this week [sic] and the pole
> lines and the pallets all put together. He's the one
> that made aware of whether the electricity of coming
> from, which pole was to feed so this is the man that
> should have had the plan in my eyes laid out for us to
> whether even if he had a mistake like this it
> shouldn't have happened.

(Docket Item 58-10 at 10-11.)

In its Reply [Docket Item 66], the Army argued that
Miller's testimony was "wholly speculative and conclusory" and
"nothing more than his own self-described beliefs, opinions,
understandings and guesses, based on no identified admissible
facts." (Army Reply at 5-7.)

First, the Court notes that, even absent Miller's
testimony, there is ample evidence to show a reasonable fact-
finder that the Army exercised supervisory control. Second, the
Court notes that "[c]redibility determinations, the weighing of
the evidence, and the drawing of legitimate inferences from the
facts are jury functions, not those of a judge. . . ." Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A jury could
conclude that Miller's statements lack credibility, but, at this

procedural posture, the Court must view the evidence in the light most favorable to the Plaintiff.

The Army's motion for summary judgment on the grounds that the Army did not supervise Clayton and the Eastern employees will be denied because there are genuine issues of material fact regarding whether the Army supervised Clayton.

### 3. The Sufficiency of Plaintiff's Administrative Notice

The Army also argues that the administrative claim form only provided notice of a failure to supervise claim and, as a result, all other claims must be barred for lack of notice.

The FTCA requires claimants to first provide administrative notice to government agencies before filing a lawsuit. 28 U.S.C. § 2675(a). "Although an administrative claim need not propound every possible theory of liability in order to satisfy section 2675(a), a plaintiff cannot present one claim to the agency and then maintain suit on the basis of a different set of facts." Roma v. United States, 344 F.3d 352, 362 (3d Cir. 2003) (internal citation omitted). Notice will "satisf[y] section 2675's requirement if the claimant (1) gives the agency written notice of his or her claim sufficient to enable the agency to investigate and (2) places a value on his or her claim." Roma at 362-63. The purpose behind this requirement is "to provide a procedure under which the government may investigate, evaluate

and consider settlement of a claim." <u>Owen ex rel. Estate of</u>
<u>O'Donnell v. United States</u>, 307 F. Supp. 2d 661, 665 (E.D. Pa.
2004).

    Plaintiff submitted an administrative claim form that
stated the following: "Steven Clayton was working as the
employee of an electrical contractor at US Army Garrison Fort
Hamilton, Brooklyn, NY when he contracted a live high voltage
wire and was electrocuted. At the time of the electrocution,
Steven Clayton was . . . being observed and supervised by a
United States government electrician, Robert Downs." (Docket
Item 48-4.) Plaintiff's Complaint provides 48 bases for
liability against the United States.[6] The Army argues that it

---

[6] The 48 bases of liability against the United States are: a.
Failing to provide plaintiff's decedent a safe place in which to
work; b. failing to adequately inspect the project for hazardous
conditions; c. Failing to coordinate with other entities,
subcontractors, and independent contractors; d. Failing to
design, maintain, engineer, fabricate, supervise, establish and
approve proper and adequate plans for the work to be performed;
e. Failing to adopt, enact, employ, enforce, and approve proper
and adequate safety programs, precautions, procedures, measures,
and plans; f. Failing to properly supervise, oversee and inspect
the electrical work, which included high voltage work; g.
Failing to perform a safety task analysis; h. Exposing
Plaintiff's decedent to peculiar and unreasonable risks and
dangers; i. Failing to stop and/or case all electrical work
until proper and necessary precautions were taken to safeguard
workers . . .; j. Failing to provide plaintiff's decedent . . .
a safe method for the performance of their work; k. Maintaining
a dangerous work site; l. Failing to ensure that the work was
done in a proper and safe manner; m. Failing to ensure that all
contractors . . . were in compliance with OSHA regulations,
industry safety practices, . . .; n. Violating and failing to
comply with applicable federal, state, and local statutes,

only had notice of Plaintiff's failure to supervise claim and

all other bases for liability must be dismissed for failure to

---

ordinances, rules, . . .; o. Violating applicable OSHA
regulations; p. Failing to approve, implement, and require
safety-related work practices; q. Failing to ensure that workers
exposed to electrocution hazard were trained in CPR; r.
Breaching its duties under various sections of the Restatement
of Torts . . .; s. Committing serious violations of the
regulations of the [OSHA]; t. Failing to ensure through proper
supervision and inspections that each worked used safety related
work practices . . .; u. Failing to train and ensure that
persons trained in first aid including CPR were available . . .;
v. Failing to ensure that all . . . known sources of electrical
energy . . . were . . . rendered inoperable . . .; w. Failing to
ensure that the lines and equipment to be worked on were tested
and de-energized . . .; x. Failing to ensure that protective
grounds were installed . . .; y. Failing to . . . exercise a
high degree of care to protect workers . . .; z. Failing to take
appropriate protective and preventative measures; aa. Failing to
ensure that the jumpers were disconnected; bb. Failing to ensure
that the wires were tested; cc. Failing to ensure that the wires
were grounded; dd. Knowingly allowing work on lines without de-
energizing the lines; ee. Failing to have a defibrillator on the
premises; ff. Failing to require and approve a full, final, and
complete Site Safety and Health Plan; gg. Failing to require and
approve a full, final, and complete Accident Prevention Plan;
hh. Failing to ensure that workers were wearing their personal
protective equipment; ii. Failing to ensure the safety of those
working on the high voltage lines; jj. Failing to ensure that
the high voltage lines were de-energized; kk. Failing to warn
workers of the dangerous conditions; ll. Failing to conduct,
attend, and participate in Pre-Construction Safety Meetings; mm.
Failing to ensure the presence of a project manager,
superintendent, and safety manager; nn. Allowing contractors to
do work and continue to work without an approved plan; oo.
Allowing contractors to work and continue to work, despite
knowledge of OSHA and safety violations; pp. Proceeding with a
plan to disconnect jumpers when defendant knew and should have
known this was a hazardous, dangerous plan; qq. Failing to
consider, recommend, and employ safer alternative plans; rr.
Failing to disconnect electrical service . . .; ss. Failing to
disconnect or open up the air switch . . .; tt. Failing to
disconnect or open up the cutout . . .; uu. Failing to provide
proper equipment and safety devices to workers; and vv. Failing
to properly train and supervise workers. (Compl. ¶ 19.)

comply with the FTCA. The Army cites the Roma case in support of this argument. In Roma, a fireman sued the United States because of injuries he sustained while fighting a fire. The fireman made two distinct factual claims: first, he alleged that the United States was liable for negligently starting or failing to prevent the fire; and, second, he argued that the federal defendants negligently instructed him to remove his breathing apparatus, which caused him to suffer smoke inhalation injuries. In his FTCA claim form, the plaintiff only said, "[C]laimant was ordered to remove his breathing respirator. . . . claimant sustained significant damage to his respitory [sic] system." Roma at 358. The Third Circuit held that "the facts concerning how the fire started and any negligence by federal employees in failing to prevent it are entirely distinct from the conduct involved in supervising the firefighting operations, including the [federal] firefighter's instruction to Roma to remove his [breathing apparatus]." Roma at 363. The Third Circuit dismissed Roma's claims regarding negligently starting or failing to prevent the fire.

Determining whether an administrative claim form provides adequate notice is a fact-specific inquiry. The Court must be mindful of the purpose behind the FTCA's notice provision, i.e. to give federal agencies sufficient notice to investigate claims. In this case, the Court finds that Plaintiff's claim

form provided sufficient notice of almost all the 48 bases of liability. The claim form's reference to Downes' supervision of the decedent gave investigators notice to examine the manner in which Clayton was working, the equipment he was using, the plan he was implementing, and the workers' alleged failure to comply with regulations.

The Court does find, however, that the Plaintiff's claim form does not provide adequate notice of the bases of liability that involve inadequate medical training and insufficient availability of medical resuscitation equipment. Those grounds are not connected to the adequacy of supervision, and the claim form did not provide notice of them. The Court will therefore dismiss the following three bases for liability: q. Failing to ensure that workers exposed to electrocution hazard were trained in CPR; u. Failing to train and ensure that persons trained in first aid including CPR were available . . .; and ee. Failing to have a defibrillator on the premises.

The United States' motion for summary judgment will be granted as to sub-parts q, u, and ee of Count I and will be denied as to the remaining 45 sub-parts.

### 4. New York Tort Law Does Not Preclude the Army's Liability

The Army's final argument is that the Army did not owe a duty of care under New York tort law because the work performed

22

was inherently dangerous and carried out in a careless manner.
The Army argues that (1) a landowner need not provide a safe
place to work when the hazard that the worker encounters is
inherent in the work the employee is hired to perform; (2) a
landowner will not be held responsible for a contractors'
defective or negligent acts in performing the contracted work;
and (3) a worker may not hold others responsible if he elects to
perform his job carelessly. The Court will address each argument
in turn. For the reasons explained below, the Army's motion will
be denied because New York tort law does not preclude liability
when there are material issues of disputed fact regarding the
landowner's supervision of the contractor.[7]

---

[7] New Jersey tort law yields the same result because, under New
Jersey law, a landowner or general contractor's "supervision of
or active participation in the manner of work of the
subcontractor may result in the imposition of a broader duty of
care, premised essentially on the emergence of a sufficient
degree of detailed superintendence over the latter's employees
as to invoke a legal relationship analagous to that of master-
servant." Wolczak v. Nat'l Elec. Products Corp., 66 N.J. Super.
64, 70-71 (App. Div. 1961). In this case, there are material
issues of disputed fact regarding the Army's supervision of
Clayton and, therefore, the Army's motion for summary judgment
merits denial under both New Jersey and New York tort law. The
Court devotes considerable attention to the specifics of New
York tort law because the Army has exclusively cited New York
tort law, and the Court seeks to fully address all of the Army's
arguments.

23

### a. Inherent Hazard Exception

The Army argues that its general duty as a landowner or general contractor to provide a safe place to work does not apply when the hazard that the worker encounters is inherent in the work that the employee is hired to perform. New York Labor Law § 200 and New York common law impose upon owners and general contractors a duty "to provide employees with a safe place to work." Anderson v. Bush Indus., Inc., 280 A.D.2d 949, 950, 720 N.Y.S.2d 699 (2001). There are exceptions to this rule. "The duty does not extend to hazards which are part of or inherent in the very work which the contractor is to perform." Id. at 950. In addition, "an owner does not owe a duty to protect a contractor's employee from hazards resulting from the contractor's methods over which the owner exercises no supervisory control." Id. at 950.

The Court finds that the Army is not entitled to summary judgment on these grounds because the cases that the Army cites either involve situations where the injured party was aware of the dangerous condition's existence or where the defendant exercised no supervisory control. The Army cites Wolfe v. Teele, 223 A.D.2d 854, 636 N.Y.S.2d 198, 199 (1996), in which the New York Appellate Division held that an employee who fell on ice while sanding an icy parking lot was not entitled to relief because "owners of real property are not responsible to one

injured through a dangerous condition which condition the injured individual had set about to remedy." Id. at 854. The Wolfe court emphasized that the plaintiff slipped "on the very icy condition he was undertaking to eliminate." Id. at 854. Wolfe does not support the Army's argument because the Wolfe plaintiff was aware that the parking lot was icy. In this case, the facts indicate that Clayton did not know that the wire was energized and that, according to the work plan that Clayton was implementing and that Downes helped devise, the wire was supposed to be de-energized.

In addition, the Court finds that there is a material issue of disputed fact regarding the extent of supervisory control that the Army exercised over Clayton's work. Several of the cases that the Army cites note that the hazard was inherent, that the defendant-employer lacked supervisory control over the plaintiff's work, and that the accident was due to the plaintiff's methods of doing the work. For example, the Army cites Anderson, in which the New York Appellate Division held that a UPS driver was not entitled to relief for a nerve injury stemming from lifting boxes from the defendant's warehouse because "the hazard of being injured as a result of repeatedly lifting heavy boxes is inherent in the work of a UPS driver." Id. at 950. The Anderson court noted that UPS "determine[d] the manner in which the work was to be performed" and that "the

injury was the result of the methods utilized by the plaintiff's employer," not the defendant. Id. at 950.

The Army also cites Gasper v. Ford Motor Co., 13 N.Y. 2d 104, 192 N.E.2d 163 (1963), in which the New York Court of Appeals held that the defendant-manufacturer was not liable for injuries suffered by a plaintiff who was working as a contractor to clean the windows at the manufacturing plant. The Gasper court noted that "the choice of equipment and manner of performing the work was left entirely to the discretion of the master window cleaners. They were in complete charge of the manner and method of prosecuting the work." Id. at 108. This fact was particularly important because "[t]he accident did not occur because of a defect in the defendant's plant, . . .  but because of the method employed by decedent in the performance of his work. . . ." Id. at 111. Gasper does not call for summary judgment in this case because there are disputed issues of material fact regarding whether the Army was in charge of the manner and method of prosecuting the work.

The Army cites Reynolds v. International Paper Co., 249 A.D. 2d 727, 671 N.Y.S. 2d 813 (3d Dept. 1998) in which the court held that a logger was not entitled to relief because loose tree limbs were "a danger inherent in logging activity." Id. at 729. The Reynolds court noted that the ultimate responsibility for checking for loose limbs lay with the logger-

26

plaintiff. For that reason, this case could be interpreted to
support the Army's argument since there is ample evidence in the
record that Clayton did not test whether the wires were live
before he touched them. But the Reynolds court also noted that
the defendant "did not supervise or control the manner in which
the trees were harvested." Id. at 728. The Reynolds court
distinguished its facts from a different case, Lincoln v.
Landvest Inc., 202 A.D.2d 933, 609 N.Y.S.2d 697 (1994), in which
summary judgment was not appropriate because, in Lincoln, "[t]he
logger testified to an almost year-long pattern of working with
a particular tree marker upon whose markings he had come to
reply, including presuming that the marker had followed required
safety procedures prior to cutting." Reynolds at 729. The Court
finds that there are disputed issues of fact regarding the
extent of the Army's supervision of Clayton, particularly
because Downes, the Army's representative, had such a long-
standing relationship with Dietz, the lineman on Clayton's crew,
and Downes was involved in directing when Clayton would do his
work and when and perhaps how the line would be de-energized.

Given the particularities of the relationship between the
Army and the Eastern crew, the questions regarding the extent of
the Army's supervisory control, and the questions regarding the
Army's decisions regarding the method of work performance, the

27

Court will deny the Army's motion for summary judgment on the grounds that electrocution is an inherent hazard.

### b. A Contractor's Defective or Negligent Acts

The Army argues that a landowner cannot be held responsible for a contractor's defective methods or negligent acts in performing the contracted work. In New York, "the duty to provide a safe place to work is not breached when the injury arises out of a defect in the subcontractor's own plant, tools and methods, or through negligent acts of the subcontractor occurring as a detail of the work." Persichilli v. Triborough Bridge & Tunnel Auth., 16 N.Y.2d 136, 145, 209 N.E.2d 802 (1965). This rule changes, however, when the owner has supervisory control: "unless the owner assumes direct supervision and control over the independent contractor's operations, he is not responsible ordinarily for the manner in which those operations are performed by the contractor or its employees." Lubrano v. Royal Netherlands S. S. Co., 622 F.2d 29, 31 (2d Cir. 1980).

Because the Army's level of supervision of Clayton and the Eastern team is a disputed issue of material fact, the Court cannot grant summary judgment on this ground. The Army cites, inter alia, Lombardi v. Stout, 178 A.D.2d 208, 211, 577 N.Y.S.2d 592 (1991), aff'd as modified, 80 N.Y.2d 290, 604 N.E.2d 117

(1992), but this case specifically notes that, although there is a general rule that an owner is not liable for the contractor's defective equipment or performance, "[t]here is an exception to this rule imposed where the owner assumes direct responsibility for the method of work performed." Id. at 210.  In other words, "the owner is not responsible for the negligent acts of others over whom he had no direction or control." Id. at 212. In this case, the Army's level of direction or control over Dietz and Clayton is a disputed material fact; summary judgment will be denied.

### c. Careless Work Performance

The Army argues that, when a worker confronts the ordinary and obvious hazards of his employment and has the time and resources to work safely, he may not hold others responsible if he chooses to perform his job so incautiously as to injure himself. The Army argues that Clayton's failure to install protective grounds and to test the lines to confirm that they had been de-energized shows that he performed his job so incautiously that the Army cannot be held liable.

In New York, "[w]hen a worker "confronts the ordinary and obvious hazards of his employment, and has at his disposal the time and other resources . . . to enable him to proceed safely, he may not hold others responsible if he elects to perform his

job so incautiously as to injure himself." Marin v. San Martin Rest., Inc., 287 A.D.2d 441, 442, 731 N.Y.S.2d 70 (2001).

The Army is not entitled to summary judgment on this ground. First, as discussed extensively above, the Army's control over Clayton's job performance is a disputed material fact. If a reasonable fact-finder could find that the Army exercised detailed supervisory control over Clayton's work performance, then a reasonable fact-finder could also find that the Army bears some responsibility for Clayton's allegedly incautious decisions on June 21, 2008. At least one of the cases that the Army cites, Marin, notes that "[a]n owner does not owe a duty to protect a contractor's employee from hazards resulting from the contractor's methods over which the owner exercises no supervisory control." Marin v. San Martin Rest., Inc., 287 A.D.2d 441-42, 731 N.Y.S.2d 70 (2001). Because a reasonable fact-finder, giving all reasonable inferences to Plaintiff, can find that the Army did exercise supervisory control, the Army is not entitled to summary judgment.

In addition, in several of the cases that the Army cites, the plaintiff was aware of the specific danger, not simply the risk of potential danger. For example, the Army cites Bombero v. NAB Const. Corp., 10 A.D.3d 170, 172, 780 N.Y.S.2d 333 (2004), a case in which a concrete and steel inspector was injured while traversing exposed rebar. The Bombero plaintiff testified that

"although he saw that the planking had been removed by [defendant] and that the planking could have been easily replaced, and although he knew traversing the exposed rebar posed a danger, he decided to walk across the rebar, causing him to lose his footing and to sustain an injury." Id. at 172. The Marin case also involves specific knowledge; the court noted that "[a]ccording to the injured plaintiff's own account, he elected to perform his job of lifting the garbage bag into the back of the sanitation truck without assistance," thus resulting in an injury because the bag was quite heavy. Marin at 442. In this case, the Army has not adduced any evidence to indicate that Clayton was aware that the line was not de-energized.

In sum, there are material issues of disputed fact regarding the Army's supervision of Clayton. These issues preclude summary judgment under either the FTCA or New York tort law. The Army's motion for summary judgment is denied, except that it is granted with respect to all claims of Theresa Clayton in her individual or personal capacity and it is granted as to sub-parts q, u, and ee of Plaintiff's Count I.

### D. Meridian's Motion for Summary Judgment

Defendant Meridian also moved for summary judgment [Docket Item 51], arguing that it did not owe Clayton a duty of care. Meridian's role with the utility pole project was to ensure that

any buildings that were going to lose power were connected to
generators. Meridian's motion will be granted because Plaintiff
has not shown that any disputed issues of material fact exist as
to whether Meridian owed Clayton a duty of care.


### 1. Parties' Arguments

Meridian argues that its role with the Utility Pole Project
was limited to monitoring the generators that provided power to
buildings while power was off. Meridian argues that it "played
no role in designing, preparing, or implementing the Utility
Pole Project relative to de-energizing high voltage power lines
. . . and played no role in supervising, directing, or
overseeing Plaintiff Clayton or any of his coworkers." (Meridian
Br. Supp. Mot. Summ. J. at 6.) Meridian argues that there is no
evidence that its actions were negligent or that its actions
were the proximate cause of Clayton's accident. Because a
negligence claim will not lie, Meridian argues that any claims
of intentional or reckless conduct also fail.

Plaintiff filed opposition [Docket Item 62] arguing that
Meridian "owed a duty of care under negligence principles based
upon the foreseeability of the harm and considerations of
fairness and policy." (Pl. Opp'n Meridian Mot. Summ. J. at 1.)
Plaintiff argues that Meridian employees owed a duty to other
subcontractors to speak up if they noticed unsafe conditions and

that its employees knew the importance of safe working
conditions, particularly in terms of electrical work. Plaintiff
asserts that Meridian failed to ensure that Eastern employees
followed a safer shutdown plan.

### 2. Meridian's Relationship with Clayton and Eastern

Meridian had a specific role in the utility pole
replacement project: its responsibility was to ensure that
buildings losing power due to shutdowns would have power through
generators. Army representative Downes explained that Meridian's
role

> was inside of each building that was maintained on
> portable and permanent generator, to make sure that it
> was turned off, the generator was hooked up. They
> would go in and make sure that all of the systems came
> back up, that there was no issues with those systems.
> And vice versa, when you bring it back off the
> generator.

(Downes Dep. 206:2-9.) Thomas Mullan, a Meridian employee,
explained that, in terms of the pole replacement project,
"[t]here were probably about three buildings or more that were
going to lose power but three buildings we had to connect
generators to, and just made sure that the building didn't lose
power." (Mullan Dep. 38:33-39:8.) Meridian employee Louie Ruiz
also testified that, during the utility pole replacement
project, Meridian's role was to "set up generators for temporary

33

power . . . during the shutdown to support power maintenance . .
. for the buildings." (Ruiz Dep. 68:25-69:4.)

Meridian employees testified that they did not participate
in the high voltage shutdown work. Ruiz stated:

> [W]e would get out direction from our supervisor, we
> are going to set up X amount of generators, X, Y, Z
> buildings, and that was our area, that was the end of
> that. Everything else with the shutdown, we had
> nothing to do with the actual shutdown of the flow of
> current on the high voltage side.

(Ruiz Dep. 88:19-25.) Ruiz further explained that high voltage
shutdown work is "not my area," (Ruiz Dep. 31:10-16), and that
"I know how to do [electrical shutdowns], but I don't do that.
That's not my place," (Ruiz Dep. 32:12-14). When Ruiz was asked
whether, before the accident occurred, he had any understanding
of "how they were going to effect the shutdown, how they were
going to de-energize the lines," Ruiz replied, "No, that wasn't
our area. We weren't involved in that." (Ruiz Dep. 87-88:25-6.)

Conversely, Eastern's employees testified that they were
not involved with the generator aspect of the project. When
asked about the availability of generators during power
shutdowns, Dietz, Eastern's lineman, testified, "Oh, I don't
know about availability of generators. I don't deal with that."
(Dietz Dep. 186:4-9.) When Dietz described the development of
the work plan to replace pole 123, he never mentioned Meridian.

All the Meridian and Eastern employees testified that they
did not know each other, did not work together, and had no
supervisory relationships with each other. When asked at
deposition whether he was familiar with Meridian, Dietz
testified that "I've heard of it somewhere." (Dietz Dep. 100:12-
15.) When asked whether he knew Ruiz or Mullan, Dietz testified
that he did not recognize their names. (Dietz Dep. 100:16-22.)
Mullan testified that he recognized the name "Eastern
Construction & Electric" because he had seen their trucks.
(Mullan Dep. 32:2-8.) Mullan stated that Eastern never provided
any direction or instruction to him, and he never provided any
direction or instruction to Eastern. (Mullan Dep. 45:13-22.)
Mullan said "It wasn't my concern what [the Eastern employees]
were doing." (Mullan Dep. 54:23-24.) Ruiz also testified that he
did not provide any directions or instructions to any Eastern
employee, and Eastern did not provide any directions or
instructions to him. (Ruiz Dep. 81:8-17.)

### 3. Meridian Did Not Owe a Duty of Care

As explained in the choice of law section above, the Court
must apply the law of New York, which is the location of the
electrocution incident, to determine whether New York or New
Jersey law applies. New York law mandates that the first step is
to determine whether there is a conflict of laws. Under either

35

New Jersey or New York law, Meridian did not owe a duty of care to Steven Clayton.

### a. Meridian Had No Duty of Care Under New Jersey Law

Plaintiff has not shown that any issue of material disputed fact exists with regard to Meridian's involvement such that Meridian owed a duty of care to Clayton.[8] In New Jersey,

> [a] major consideration in the determination of the existence of a duty of reasonable care under general negligence principles is the foreseeability of the risk of injury. . . . In addition, the determination of such a duty involves identifying, weighing, and balancing several factors--the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.

Alloway v. Bradlees, Inc., 157 N.J. 221, 230, 723 A.2d 960, 964 (1999).

Plaintiff argues that the accident was foreseeable to Meridian employees and, therefore, that Meridian owed Clayton a duty of care. Plaintiff points to an August 25, 2008 statement that Louie Ruiz made discussing the June 21, 2008 accident. Ruiz stated

---

[8] Plaintiff argues that whether a defendant breached a duty of care and whether defendant's actions were the proximate cause of a plaintiff's injuries are questions for the factfinder. Whether or not the question of a breach of duty must be determined by the factfinder, the fact remains that Plaintiff has not established the first requirement, i.e. that there is a genuine issue of material fact regarding whether Meridian had any duty of care.

> I told [Meridian employee] Mr. Mullan "If someone
> listened to us this wouldn't happened." . . . I was
> talking to my partner Mr. Mullan about the plan layout
> Mr. Downes gave us. We were asking ourselves why they
> did not disconnected the air switch and the cutouts on
> poles 249 and 137, which we thought it was safer to
> disconnect and power up building 201 with a generator.
> We had another generator in case they wanted to shut
> down 201 but nobody asked for it.

(Docket Item 62-2 at 2.) Plaintiff also notes that Mullan stated

at his deposition that "If Eastern wanted to be safe they needed

to open the air switch on 249 and lock it. But they wanted to

keep the power on 201. I don't know who made this decision. . .

. This was a preventable accident." (Pl. Opp'n Meridian Mot.

Summ. J. at 9.) Even assuming that the accident was foreseeable

to Meridian employees, the "ability to foresee injury to a

potential plaintiff does not in itself establish the existence

of a duty." Carvalho v. Toll Bros. & Developers, 143 N.J. 565,

572, 675 A.2d 209, 212 (1996).

    Plaintiff has not shown that any genuine issue of material

fact exists to show that the Meridian had any relationship with

Clayton or that Meridian had the opportunity and ability to

prevent the accident. Plaintiff notes that Meridian was required

"to provide all management, supervision, personnel, . . . and

safety equipment . . . necessary to perform all requirements of

the Performance Work Statement." (Pl. Opp'n Meridian Mot. Summ.

J. at 2.) The Performance Work Statement involved "housing

services, operation, maintenance, and repair of real property

37

facilities." The Work Statement required Meridian to take "proper safety and health precautions to protect the work, the employees, the public and property of others" and that Meridian "shall require the use of safety equipment, personal protective equipment, and devices necessary to protect the employee." (<u>Id.</u> at 3.)

Plaintiff has not adduced any evidence that could show a reasonable fact-finder that Clayton was an employee of Meridian or that Meridian's contractual obligations to conduct work safely applied to the replacement of the high voltage utility poles. The fact that Meridian's contract required it to conduct its operations safely does not mean that Meridian had a duty to conduct the utility pole replacement project safely. Plaintiff has not pointed to any aspect of the Performance Work Statement stating that Meridian has obligations to conduct or supervise high voltage electrical work. Plaintiff has emphasized that Meridian's employees made statements after-the-fact suggesting that the approach to de-energizing pole 123 was unsafe and that Meridian employees had a policy of speaking up if they observed unsafe conditions. Even if Meridian's employees had known about the unsafe approach before the accident, Plaintiff has not adduced any evidence to show a reasonable fact-finder that Meridian had the opportunity or authority to dictate how pole 123 should be replaced.

Plaintiff cites two New Jersey cases to support her argument that Meridian owed a duty of care, but these cases support summary judgment for Meridian. First, Plaintiff cites Alloway v. Bradlees, 157 N.J. 221 (1999), in which the New Jersey Supreme Court held that a general contractor owed a duty of care to a subcontractor's employee who was injured by a defective piece of the subcontractor's equipment. The general contractor in Alloway had once repaired the defective piece of equipment and, after the plaintiff reported more problems, the general contractor called plaintiff the day before the accident and told her that it would be repaired or replaced by the next day. It was not repaired or replaced, and the equipment severely injured the plaintiff. In the present case, Plaintiff has not adduced any evidence indicating that Meridian had any role with the equipment that Steven Clayton used. In addition, in Alloway, the principal owner of the subcontractor was a superintendent for the general contractor. The Alloway court held that "there was a substantial and close relationship between the parties that could and did implicate workplace safety concerns." Alloway at 232. In the present case, Plaintiff has not adduced any evidence showing a genuine issue of material fact regarding whether any relationship existed between Meridian and Clayton or Eastern.

Plaintiff also cites Carvalho v. Toll Bros. and Developers, 143 N.J. 565 (1996), in which the New Jersey Supreme Court held that an engineer had a duty to exercise care for the safety of workers when the engineer has a contractual responsibility for the progress of work and was aware of unsafe working conditions. The Carvalho court noted that the engineer had the contractual authority to stop work on the project and that "there was an overlap of work-progress considerations and work-safety concerns." Carvalho at 575. The Carvalho court also noted that "[t]he element of control arising from the relationship between the parties and the opportunity and capacity of defendant to have avoided the risk of harm are also relevant in considering the fairness in imposing a duty of care." Carvalho at 576. In the present case, Plaintiff has not adduced any evidence indicating that Meridian had any control over Clayton's work.

Essentially, Meridian did not owe a duty of care under New Jersey law because no reasonable fact-finder could find that there was a relationship between the parties or that Meridian had either the opportunity or the ability to influence Clayton's work.

### b. Meridian Had No Duty of Care Under New York Law

In New York, "[t]he threshold question in any negligence action is: does defendant owe a legally recognized duty of care

to plaintiff?" <u>Hamilton v. Beretta U.S.A. Corp.</u>, 96 N.Y.2d 222,

232, 750 N.E.2d 1055, 1060 (2001), <u>opinion after certified</u>

<u>question answered,</u> 264 F.3d 21 (2d Cir. 2001). New York courts

traditionally

> fix the duty point by balancing factors, including the
> reasonable expectations of parties and society
> generally, the proliferation of claims, the likelihood
> of unlimited or insurer-like liability,
> disproportionate risk and reparation allocation, and
> public policies affecting the expansion or limitation
> of new channels of liability.

<u>Id.</u> at 232. The New York Court of Appeals explained its

reluctance to extend liability to defendants for their failure

to control others' conduct:

> We have been cautious, however, in extending liability
> to defendants for their failure to control the conduct
> of others. . . . This judicial resistance to the
> expansion of duty grows out of practical concerns both
> about potentially limitless liability and about the
> unfairness of imposing liability for the acts of
> another. A duty may arise, however, where there is a
> relationship either between defendant and a third-
> person tortfeasor that encompasses defendant's actual
> control of the third person's actions, or between
> defendant and plaintiff that requires defendant to
> protect plaintiff from the conduct of others. . . .
> The key in each is that the defendant's relationship
> with either the tortfeasor or the plaintiff places the
> defendant in the best position to protect against the
> risk of harm.

<u>Hamilton v. Beretta U.S.A. Corp.</u>, 96 N.Y.2d 222, 232-33, 750

N.E.2d 1055, 1061 (2001), <u>opinion after certified question</u>

<u>answered,</u> 264 F.3d 21 (2d Cir. 2001). As explained above,

Plaintiff has not shown that any genuine issue of material fact

41

exists as to whether Meridian had a relationship with Steven
Clayton such that it could control his actions or such that it
was in the best position to protect against the risk of harm.
Under New York law, the outcome is the same as under New Jersey
law: No reasonable fact-finder could find that Meridian owed
Plaintiff a duty of care.

### 4. Plaintiff's Request for Additional Time Is Denied

The Plaintiff requests that, if the Court finds Meridian's
motion to be meritorious, then the Court should defer
consideration or deny the motion to allow plaintiff additional
time until after plaintiff's expert witness deadline pursuant to
Fed. R. Civ. P. 56(d).[9]

Plaintiff's request is denied. Fed. R. Civ. P. 56(d)
specifically addresses the circumstance where "facts are
unavailable to the nonmovant" and allows a nonmovant to "show[]
by affidavit or declaration that . . . it cannot present facts
essential to justify its opposition. . . ." Fed. R. Civ. P.

---

[9] Expert discovery has been stayed, pursuant to an amended
scheduling order [Docket Item 44], pending the resolution of
summary judgment motions. As explained below, expert witness
discovery will not create genuine issues of material fact
regarding whether Meridian and Clayton had a relationship, since
the existence of a relationship is a factual question. In
addition, if Plaintiff believed that expert witness discovery
was necessary to oppose summary judgment motions, Plaintiff
should not have agreed to stay such discovery pending the
resolution of the summary judgment motions.

56(d). Plaintiff has not submitted any affidavit or declaration, nor has Plaintiff indicated that there are facts essential to its opposition that it cannot present. Expert witness discovery will not develop the factual record and will not create genuine issues of material fact regarding whether a relationship existed between Meridian and Eastern, which is a factual matter.

Meridian's motion for summary judgment is granted.


**VI. CONCLUSION**

The United States' motion for summary judgment is granted with respect to all claims of Theresa Clayton in her individual or personal capacity because Theresa Clayton did not file an administrative notice under the FTCA. The word "individually" shall be deleted from the case caption, which shall now read "Plaintiff Theresa Clayton, as Administratrix . . . of the Estate of Steven Clayton. . . ." The United States' motion for summary judgment on the grounds of lack of administrative notice will be granted as to sub-parts q, u, and ee of Plaintiff's Count I, which alleges negligence. The United States' motion for summary judgment will be denied in all other respects because material issues of disputed fact exist regarding the extent of the United States' supervision of decedent Steven Clayton.

Meridian Management Corporation's motion for summary judgment will be granted because Plaintiff has not shown that a

43

genuine issue of material fact exists regarding whether Meridian owed Plaintiff a duty of care. All claims against Defendant Meridian Management Corporation are dismissed.

The accompanying order shall be entered.

**December 18, 2012**
Date

**s/  Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge

44